UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MARC COHEN; ROBERT ROWAN, JR., on behalf of themselves and all others similarly situated, | x : : : |
| Plaintiffs, v. | : : : **10 CIV 8960** : Civil Action No. |
| JPMORGAN CHASE & CO.; J.P. MORGAN CLEARING CORP.; J.P. MORGAN SECURITIES INC.; HSBC HOLDINGS PLC; HSBC SECURITIES (USA) INC.; AND HSBC BANK USA NATIONAL ASSOCIATION, | : : **CLASS ACTION COMPLAINT** : : **JURY TRIAL DEMANDED** : : |
| Defendants. | : : : : : |
|  | x |



Plaintiffs Marc Cohen and Robert Rowan, Jr., individually and on behalf of themselves and a class of all others similarly situated, bring this action against Defendants for violating Sections 9(a) and 22(a) of the Commodity Exchange Act, 7 U.S.C. §§ 13(a) and 25(a), Section 1 of the Sherman Act, 15 U.S.C. § 1, and New York state law, and demands a trial by jury.

## NATURE OF THE CASE

1.      Defendants intentionally manipulated, and combined and conspired, the prices of silver future and options contracts traded on the Commodity Exchange Inc. ("COMEX") in ways calculated to decrease the profitability of long positions between June 1, 2008 and the present (the "Class period").

2.      Defendants' illegal acts of manipulation included, among other acts: (a) amassing extremely large short positions in silver futures and options contracts; (b) maintaining a substantial, concentrated amount of the open interest in silver futures; (c) communicating with

1

each other, including signaling, about their trades of COMEX silver futures and options contracts; and (d) submitting unconsummated but publicized orders that they withdrew before they could be executed (known as "spoof orders") but that still influenced pricing of COMEX silver futures and options contracts.

3.    Plaintiff's complaint comes on the heels of a far-ranging investigation by the Enforcement Division of the Commodity Futures Trading Commission ("CFTC") into misconduct in the silver market and recent pubic comments by an industry whistleblower with knowledge of the misconduct who has been working with the CFTC in its investigation for the past year. The CFTC began its investigation into Defendants' misconduct in the silver market in September 2008 after receiving e-mails from hundreds of investors complaining about the price of silver. After receiving even more complaints, the CFTC eventually took the unusual step of publicly announcing that it had launched an investigation into the matter.

4.    Based on the industry whistleblower's assistance (described below), the CFTC is investigating, among other things, the COMEX trades of Defendant JPMorgan and others in silver futures and options contracts, as well as their trades on the London Bullion Market Association's Exchange, which is the physical delivery market for silver. As part of the CFTC investigation, CFTC lawyers in recent months have interviewed employees of JPMorgan's metal trading business, as well as industry traders, commodity executives, experts and employees of other metals trading firms. The CFTC's enforcement staff has circulated an information packet to CFTC lawyers and the five commissioners, outlining some of the investigation's findings, including documents that may suggest that there have been attempts to manipulate pricing.

5.    At a recent CFTC hearing held on October 26, 2010, CFTC Commissioner Bart Chilton publicly stated that market participants (whose identity he could not publicly reveal)

have made "repeated" and "fraudulent efforts to persuade and deviously control" silver prices, and that this misconduct "should be prosecuted." He further stated that there had been "violations of the Commodity Exchange Act in the silver market." Commissioner Chilton also expressed his "hope[] that the agency will speak publicly about the investigation in the very near future."

6.       In March 2010, the industry whistleblower, Andrew Maguire, a London-based metal trader and former Goldman Sachs trader, came forward to publicly reveal that he had been cooperating with CFTC staff into Defendants' unlawful conduct since November 2009, and disclosed several e-mails that he previously had shared with the CFTC that he believes contain evidence of Defendants' misconduct.

7.       The insider first contacted the CFTC in November 2009 to report Defendants' conspiracy to manipulate prices in the silver market. The insider described to the CFTC how JPMorgan silver traders signaled market participants in advance of their manipulation so that they, as well as other traders, could obtain large profits by artificially and illegally manipulating the profitability of long positions under COMEX silver futures and options contracts.

8.       Later in 2009 or early 2010, the insider told CFTC staff that he had witnessed JPMorgan signal the market that it intended to manipulate the profitability of long positions under COMEX silver futures and options contracts with others, including on or around the date when options (whose value is tied to the underlying price of COMEX silver futures contracts) were set to expire. He then sent the CFTC staff then-current e-mails where he correctly predicted Defendants' price manipulation, noting that he could not have such accurate, advance information about this misconduct if COMEX silver futures and options contracts were not being illegally manipulated.

9.     A comparison of Defendants' conduct concerning and pricing of silver and silver futures before and after the public revelations of March 2010 offers further proof that the alleged misconduct occurred and that Plaintiff and the proposed class members were injured as a result. Indeed, before the news broke, silver prices greatly underperformed gold prices, but afterwards, the exact opposite has occurred. No fundamental changes in supply or demand for silver have occurred during this period that could provide a legitimate explanation for this stark divergence. In addition, after the news broke in March 2010, Defendants reduced the amount of their unlawful conduct and unwound their massive short positions compared to the overall open interest in the silver futures market.   And the JPMorgan Defendants announced that they were ceasing their metals trading business.

10.     The plaintiffs are large traders in the COMEX silver market, and they were harmed significantly by the Defendants' price manipulation.   Their damages occurred not only because the Defendants' improperly suppressed the price of silver, but also because the Defendants' caused the price of silver to trade with little volatility and thus prevented traders from profit opportunities that would have been available absent Defendants' price manipulation. By contrast, Defendants reaped significant profits from their unlawful and manipulative suppression of COMEX silver futures and options contracts.

## JURISDICTION AND VENUE

11.     This action arises under Sections 9(a) and 22(a) of the Commodity Exchange Act, 7 U.S.C. §§ 13(a) and 25(a), Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

4

12.     This Court has subject matter jurisdiction under Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, Sections 9(a) and 22(a) of the Commodity Exchange Act, 7 U.S.C. §§ 13(a) and 25(a), and 28 U.S.C. §§ 1331 and 1337.

13.     Venue is proper in this District pursuant to Sections 9(a) and 22(a) of the Commodity Exchange Act, 7 U.S.C. §§ 13(a) and 25(a), and Section 4(a) of the Clayton Act 15 U.S.C. § 15(a), and 28 U.S.C. § 1391(b), (c) and (d), because Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

14.     This Court has personal jurisdiction over each Defendant because each Defendant: transacted business throughout the United States, including in this District; traded COMEX silver futures and options contracts throughout the United States, including in this District; had substantial contacts with the United States, including in this District; or engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## PARTIES

## PLAINTIFFS

15.     Plaintiff Marc Cohen ("Cohen") is a resident of New York City. During the Class Period, Cohen traded COMEX silver futures and contracts. He was injured as a result of Defendants' anticompetitive acts and market manipulation.

16.     Plaintiff Robert Rowan, Jr. ("Rowan") is a resident of Connecticut. During the Class Period, Rowan traded COMEX silver futures and contracts. He was injured as a result of Defendants' anticompetitive acts and market manipulation.

5

## DEFENDANTS

### JP Morgan Defendants

17.     Defendant JPMorgan Chase & Co. ("JPMorgan Chase") is a Delaware financial holding company with its principal place of business in New York, New York.  JP Morgan Chase is one of the world's leading financial services companies as well as one of the United States' largest banking institutions.

18.     Defendant J.P. Morgan Clearing Corp. ("JPMC"), formerly known as Bear, Stearns Securities Corp., is a Delaware corporation with its principal place of business in Brooklyn, New York.  JPMC is a subsidiary of Defendant J.P. Morgan Securities Inc.  JPMC is a CFTC registered Futures Commission Merchant.

19.     Defendant J.P. Morgan Securities Inc. ("JPMS") is a Delaware corporation with its principal place of business in New York, New York.  JPMS is a wholly owned subsidiary of JPMorgan Chase.  JPMS, through its JPMC subsidiary, provides securities and futures clearing, customer financing, securities lending, and related services.

20.     Defendant J.P. Morgan Futures Inc. ("JPMF") is a Delaware corporation with its principal place of business in New York, New York.  JPMF is a CFTC registered Futures Commission Merchant.  It is a wholly owned subsidiary of JPMorgan Chase.  It provides research, execution, sales, and clearing services in futures and options contracts across fixed income, equity, foreign exchange, and commodity asset classes.  JPMF holds the United States accounts of JPMorgan Chase's global futures and options business customers.

21.     Defendants JPMorgan Chase, JPMC, JPMS, and JPMF collectively are referenced as the JPMorgan Defendants.

6

## HSBC Defendants

22.     Defendant HSBC Holdings plc ("HSBC Holdings") is a United Kingdom public limited company with its corporate headquarters located in London, England. HSBC Holdings was the world's largest banking group and the world's sixth largest company as of 2009.

23.     Defendant HSBC Securities (USA) Inc. ("HSBC USA") is a Delaware corporation with a corporate office located in New York, New York. HSBC USA is a wholly owned subsidiary of HSBC Markets (USA) Inc., whose ultimate parent is Defendant HSBC Holdings. HSBC USA is a registered securities broker-dealer under the Securities Exchange Act of 1934 and is a CFTC registered Futures Commission Merchant.

24.     Defendant HSBC Bank USA National Association ("HSBC NA") is a Texas company with an office in Wilmington, Delaware.

25.     Defendants HSBC Holdings, HSBC USA, and HSBC NA collectively are referenced as the HSBC Defendants.

## CO-CONSPIRATORS

26.     Various other individuals, firms and corporations, not named as Defendants herein, may have participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy. Plaintiff reserves the right to name subsequently some or all of these individuals or entities as defendants.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "class"):

> All persons and entities that entered into, liquidated or permitted to expire long positions on COMEX silver futures contracts or options, and/or traded based on the volatility of silver futures contracts or options, between as early as June 1, 2008 through such time as the effects of Defendants' unlawful conduct ceased.

Excluded from the class are Defendants, their parent companies, subsidiaries and affiliates, co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies, and instrumentalities.

28.   Plaintiff believes that there are thousands of class members, the exact number and their identities being known by Defendants, making the class so numerous and geographically dispersed that joinder of all members is impracticable.

29.   There are questions of law and fact common to the class, including:

(a)   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to artificially manipulate prices in ways calculated to decrease the profitability of long positions under COMEX silver futures and options contracts;

(b)   The identity of the conspiracy's participants;

(c)   The duration of the conspiracy alleged in this Complaint and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)   Whether the alleged conspiracy violated Section 1 of the Sherman Act and New York General Business Law § 349;

(e)   Whether the alleged manipulative conduct violated the Commodity Exchange Act;

(f)   Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other class members;

(g)   The effect of the conspiracy on the profitability of long positions under COMEX silver futures and options contracts during the class period; and

(h)   The appropriate class-wide measure of damages under the Commodity Exchange Act and the Sherman Act.

30.   Plaintiff's claims are typical of the claims of class members, and Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff and all members of the class are similarly affected by Defendants' wrongful conduct in violation of the antitrust laws and the commodities laws in that they entered into, liquidated, or permitted to expire long positions under COMEX silver futures or options contracts whose profitability was artificially depressed by Defendants.  Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other class members.  Plaintiff's interests are coincident with, and not antagonistic to, those of the other class members.

31.   Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

32.   The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

33.   The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

34.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The class is readily definable.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  This class action presents no difficulties in management that would preclude maintenance as a class action.

9

## INTERSTATE TRADE AND COMMERCE

35.    The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

36.    During the class period, Defendants and their co-conspirators engaged in numerous transactions involving COMEX silver futures and options contracts in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

37.    The misconduct in which Defendants and their co-conspirators engaged had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## FACTUAL ALLEGATIONS

## BACKGROUND ON SILVER FUTURES AND OPTIONS CONTRACTS AND THEIR TRADING ON COMEX

38.    COMEX is a division of the New York Mercantile Exchange, and has been designated by the CFTC as a contract market pursuant to Section 5 of the Commodity Exchange Act, 7 U.S.C. § 7. COMEX submits to the CFTC numerous rules and regulations by which COMEX designs, creates terms and conditions of, and oversees trading in various precious metals futures and options contracts, including those for silver.

39.    COMEX is an organized, centralized market that provides a forum for trading silver futures and options contracts.

40.    A silver futures contract is an agreement between two parties to buy or sell a fixed amount of silver at a set future date.

41.    COMEX provides standardized silver futures contracts with delivery dates beginning with the next calendar month, and possibly extending as far into the future as 60 months depending on the month that the contract was executed. COMEX specifies the terms of trading, including the

10

trading units, price quote, trading hours, trading months, minimum and maximum price fluctuations, and margin requirements.

42.     Trading on silver futures contracts, like futures contracts for other commodities, have two sides: a "long" side and a "short" side. The long side denotes the contract's buyer, who must pay for the underlying silver and take delivery of it. The short side, on the other hand, denotes the contract's seller, who must receive payment for the underlying silver and deliver it.

43.     If a silver futures trader holds its position on the contract until the end of the settlement period, then he or she is obligated to "go to delivery." In other words, upon the settlement date, the futures contract for a particular month becomes a present contractual obligation for the purchase and sale of the underlying actual silver. Longs must take, and shorts must make, delivery of 5,000 troy ounces per contract over the course of the contract month. The price of silver that goes to delivery is known as the "settlement price" of the COMEX silver futures contract.

44.     At any given time, one half of the participants in the futures market are short, and the other half are long.

45.     In the commodity futures markets, more than 99% of the contracts do not result in actual delivery of the underlying commodity, and may remain open for periods of numerous months with no delivery of the commodity. Rather, traders typically offset their futures positions before their contracts mature. The difference between the initial purchase or sale price and the price of the subsequent offsetting transaction constitutes the realized profit or loss.

46.     Traders can "go short" in numerous ways. One can sell a futures contract, which obligates the seller to deliver silver at a set future date at a set price. One also can sell call options, which confers upon the buyer the right, rather than obligation, to buy silver from the

11

seller at a set "strike price" at a set future date known as "expiry." At expiry, if the price of silver exceeds the strike price, the buyer will exercise the option to buy, and the seller must pay the difference between the prevailing price of silver and the strike price; if the price of silver is lower than the strike price, then the option expires "out of the money."

47.     At any rate, the trader that has a short position benefits financially as prices fall. In the situation of selling a futures contract, the seller at contract expiration offsets his position by buying a futures contract and keeps the price differential. In the situation of a call option, the seller benefits when the prevailing price is below the strike price, whereby he or she collects the option premium and pays nothing to the buyer.

48.     Upon information and belief, Defendants had net short positions in silver options contracts, including the sale of call options.

49.     Futures prices for an underlying commodity, such as silver, and the price of the underlying commodity are directly correlated to each other. This is because a futures price is simply the market's consensus expectation of the price in the spot market for the commodity at a specified future date.

50.     For a commodity producer, the increase in the commodity's price for delivery in a later month makes it more profitable for the producer to shift sales from the current month to the later month. For commodity purchasers, on the other hand, the increase in price for delivery at the later month incentivizes them to buy today rather than wait until the later month, when the product is expected to cost more to buy. Consequently, a current increase in futures prices causes producers to decrease the available supply of the commodity and causes buyers to increase their demands for the respective product. Under basic laws of supply and demand, therefore, current spot prices for the product rise. The same causal economic relationship exists

12

if futures prices decline, with the obvious differences being that the producers will increase available supply, buyers will decrease demand, and current spot prices will drop.

## CHARACTERISTICS OF COMEX SILVER FUTURES AND OPTIONS CONTRACTS MARKET MAKE IT PARTICULARLY SUSCEPTIBLE TO COLLUSION

51.     The trading volume of the silver futures market is small, or "thin," in comparison to the markets for other commodities. By way of example, while there were only about 130,000 open interest COMEX silver futures contracts that had not settled as of August 2008, there were 1.25 million open interest NYMEX light sweet crude oil futures contracts that had not yet settled at that time, and over 400,000 open interest COMEX gold futures contracts that had not yet settled as of that time.

52.     The market for COMEX silver futures and options contracts is highly concentrated, with a few very large financial institutions, namely Defendants, controlling an extremely high percentage of all futures and options contracts.

53.     In March 2008, JPMorgan purchased Bear, Stearns and its substantial short positions in COMEX silver futures and options contracts.

54.     As of August 2008, the JPMorgan Defendants and the HSBC Defendants collectively controlled over 85% of the commercial net short position in COMEX silver futures contracts and 25% of all open interest short positions. These positions represented a short interest of 169 million troy ounces of silver, equal to about 25% of annual world mine production. Notably, Defendants' short positions in COMEX silver futures contracts far exceeded that of the Hunt brothers, who settled charges with the CFTC amid charges that they manipulated the silver market in the 1970s.

55.     As of the first quarter of 2009, HSBC NA alone held 40% of all precious metal derivatives (excluding gold) that commercial banks held, and Defendants collectively owned

13

more than 96% of all precious metal derivatives (excluding gold), with a combined notional value (the value of the underlying assets as determined by spot price) of $7.9 billion.

56.    As silver market trader Ananthan Thangavel of Lakshmi Capital has noted, Defendant's overwhelming short interest created a situation where "the world's silver supply and mining production is not enough to satisfy the increasing industrial demand." This "huge shortfall" in available silver meant there was "a far larger outstanding position" in silver short interest than "could possibly be hoped to be mined this year."

57.    These market characteristics - a thin trading volume and a highly concentrated market - enabled Defendants to manipulate silver futures and options contract prices during the class period by flooding the market with a disproportionate number of silver futures contracts on COMEX and communicating with each other to manipulate and suppress prices for those contracts.

## DEFENDANTS' MANIPULATION CONSPIRACY

### Ongoing CFTC Investigation

58.    In September 2008, following "numerous letters, e-mails and phone calls" from investors and industry participants, the CFTC's Enforcement Division commenced an investigation into manipulation in the silver market. The investigation is ongoing.

59.    After receiving yet more complaints alleging manipulation, the CFTC subsequently took the unusual step of publicly announcing that it had launched an investigation into the matter.

60.    Based on an industry insider's assistance (which is described in detail below), the CFTC has focused its investigation on manipulation in both the physical silver market and the COMEX silver futures market.

14

61.     Federal law enforcement officials are investigating, among other things, the COMEX trades of JPMorgan and others in silver futures and options contracts, as well as their trades on the London Bullion Market Association's Exchange, which is the physical delivery market for silver.

62.     In recent months, CFTC lawyers have interviewed employees of JPMorgan's metal trading business, as well as industry traders, commodity executives, experts and employees of other metals-trading firms, according to an article from the October 27, 2010 *Wall Street Journal*.

63.     According to the same *Wall Street Journal* article, the CFTC's enforcement staff has circulated an information packet to CFTC lawyers and the five commissioners, outlining some of the investigation's findings, including documents that may suggest that there have been attempts to manipulate pricing.  In recent days, the commissioners have discussed how to proceed in the investigation, but have not yet reached a decision.

64.     At a CFTC hearing held on October 26, 2010 to consider new rules to strengthen its commodity enforcement powers, CFTC Commissioner Bart Chilton publicly stated that unidentified market participants have made "repeated" and "fraudulent efforts to persuade and deviously control" silver prices, and that this misconduct "should be prosecuted." He further stated that there had been "violations of the Commodity Exchange Act in the silver market." Commissioner Chilton also expressed his "hope[] that the agency will speak publicly about the investigation in the very near future."

### Industry Insider Assisting CFTC Staff in Investigation

65.     On or about March 30, 2010, an industry insider, Andrew Maguire, publicly revealed that he had been cooperating with CFTC staff into Defendants' unlawful conduct for

15

some time, and disclosed several e-mails that he had shared with the CFTC that he claimed constituted evidence of Defendants' misconduct. Maguire is a London-based metal trader and former Goldman Sachs trader.

66.     In November 2009, the insider first contacted the CFTC and reported Defendants' conspiracy to manipulate prices in the silver market. The insider described to the CFTC how JPMorgan silver traders signaled market participants in advance of their manipulation so that they, as well as other traders, could obtain large profits by artificially and illegally manipulating the profitability of long options on COMEX silver futures and options contracts.

67.     Later in 2009 or early 2010, the insider told CFTC staff that he had witnessed JPMorgan signal the market that it intended to manipulate silver prices with others, including on or around the date where options were no longer valid and, thus, ceased to exist ("options expiry").

68.     According to the insider, JPMorgan signaled HSBC and other co-conspirators to join its manipulation of COMEX silver futures and options contracts by flooding the market with short positions, "flushing out the long holders," and "controlling silver's rise."

69.     JPMorgan sent signals on a monthly basis on or around the dates of certain important events, including following the United States Department of Labor's issuance of the Non-Farm Payroll Report, an influential statistic and economic indicator, which is released during the first week of each month; during COMEX silver futures contract roll-over, which occurs each month when a futures contract holder exchanges (or rolls over) an expiring contract position for one expiring at a later date; and at the time of options expiry on the last four business days of each month.

70.     Regarding the last event mentioned above, because Defendants held net short positions in COMEX silver options contracts, they profited by manipulating the profitability of long positions of COMEX silver futures contracts.  By doing so, Defendants ensured that the long options contracts opposite their short positions would expire out of the money.  When that occurred, the counterparties to Defendants would not exercise their options, and Defendants profited.

71.     In addition, the insider described signals that Defendants utilized on a daily basis, which the insider coined the "daily silver fix."  During certain times of day, usually when COMEX trading volume is light, Defendants would rapidly dump large amounts of COMEX silver futures contracts at or around the same depressed price.  Defendants and their co-conspirators understood that the price of these contracts would set the direction of silver futures contract prices for that day.  As the insider wrote in a January 26, 2010 e-mail to Eliud Ramirez, a senior investigator for the CFTC's Enforcement Division:  "As an example, if you look at the trades just before the pit open today you will see around 1,500 contracts sell at once where the bids were tiny by comparison in the fives and tens.  This has the immediate effect of gaining $2,500 per contract on the short positions against the long holders, who lose that in moments and likely were stopped out."

72.     Jeffrey Christian, Managing Director and founder of CPM Group, a New York-based commodities and research consulting firm, echoed the insider's account of the "daily fix."  Christian recently testified before the CFTC that "there are times when companies enter the market with large trades during the New York pre-market, apparently with the intention of moving prices in their favor by placing a large order or orders before the liquidity is there to accommodate such trades."

73.    In a February 3, 2010 e-mail to Ramirez, the insider wrote that he had received a signal from Defendants showing their intent to depress prices of COMEX silver futures and options contracts two days later, at or near the time of the announcement of the Non-Farm Payroll Report. He then predicted how the manipulation would happen:

> Scenario 1.   The news is bad (employment is worse).   This will have a bullish effect on gold and silver as the U.S. dollar weakens and the precious metals draw bids, spiking them higher.   This will be sold into within a very short time (1-5 mins) with thousands of new short contracts being added, overcoming any new bids and spiking the precious metals down hard, targeting key support levels.
>
> Scenario 2.   The news is good (employment is better than expected).   This will result in a massive short position being instigated almost immediately with no move up.   This will not initially be liquidation of long positions but will result in stops being triggered, again targeting key support levels.
>
> Both scenarios will spell an attempt by the two main short holders [JPMorgan and HSBC] to illegally drive the market down and reap very large profits.   Locals such as myself will be 'invited' on board which will further add downward pressure.
>
> The question I would expect you might ask is:  Who is behind the sudden selling and is it the entity/entities holding a concentrated position?  How is it possible for me to know what will occur days before it will happen?
>
> Only if a market is manipulated could this possibly occur.

74.    Later that day, the price of silver fell drastically following Defendants' manipulation. Two days later, the insider e-mailed Ramirez "to confirm that the silver manipulation was a great success and played out EXACTLY to plan as predicted . . ." He further added: "How would this be possible if the silver market was not in the full control of [JPMorgan and HSBC] . . . I hope you took note of how and who added the short sales (I certainly have a copy) and I am certain you will find it is the same concentrated shorts [JPMorgan and HSBC] who have been in full control since [JPMorgan] took over the Bear Stearns position [in March 2008]."

18

75.     The insider also claimed that traders for the JPMorgan Defendants bragged during the class period about their large trades that successfully moved silver prices.

76.     Soon after the insider went public with his allegations on or about March 30, 2010, Defendants began to unwind their enormous short positions. According to the CFTC Bank Participation Reports, which provide statistical data on the number of COMEX silver futures contracts and relative positions of domestic and foreign banks, the net short position of silver futures held by commercial banks, of which Defendants comprise a sizeable majority, have been reduced by more than 30% that time. As Defendants' short positions have decreased, the price of silver has risen appreciably. Silver prices have increased 40% this year, reaching its highest level in three decades on October 14.

77.     A comparison of Defendants' conduct concerning and pricing of silver and silver futures before and after the public revelations of March 2010 also strongly suggests that the alleged misconduct in fact occurred and that Plaintiff and the proposed class members were injured as a result.

78.     Before news broke of the insider's participation in the CFTC investigation, silver prices greatly underperformed gold prices. Between March 2008 and March 2010, gold prices increased by approximately 20%, whereas silver prices decreased by about 25% during that period.

79.     After March 2010, the opposite has occurred, as silver prices greatly have outperformed gold price. The prices of silver futures traded on the COMEX have increased by about 50% since March 2010, whereas gold prices have increased only by about 20% since that time. Significantly, no fundamental changes in supply or demand for silver or other purely market-based developments have occurred during this period to explain this reversal of fortune.

19

80.    In addition, after March 2010, Defendants reduced the amount of their unlawful conduct and unwound their massive short positions compared to the overall open interest in the silver futures market. Further, the JPMorgan Defendants announced that they were ceasing their metals trading business.

## ADDITIONAL CHARACTERISTICS OF COMEX SILVER FUTURES AND OPTIONS CONTRACTS MARKET MAKE IT CONDUCIVE TO COLLUSION

81.    In addition to the previously discussed market factors of thin trading volume and a high degree of market concentration, several additional market factors enabled and facilitated Defendants' manipulative and anticompetitive scheme.

### Commodity-Like Product

82.    A commodity-like product is one that is standardized across sellers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different sellers are viewed as interchangeable by purchasers, it is easier for the suppliers both to agree on prices for the product and to monitor these prices.

83.    COMEX silver futures and options contracts are homogeneous, commodity-like products. COMEX specifies the terms of each contract, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations, and margin requirements.

84.    Because COMEX silver futures and options contracts are commodity-like products, purchasers make purchase decisions based on price.

### Opportunity to Conspire

20

85.    Defendants are members of many of the same trade associations.    Trade association meetings provide the opportunity for participants in conspiracies such as this one to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.   Accordingly, they had ample opportunity to discuss and share confidential pricing information and trading strategy, and come to the anticompetitive agreement alleged here here.

86.    Defendants are members of the Futures Industry Association ("FIA"), the Futures and Options Association ("FOA"), and the London Bullion Market Association ("LBMA").

87.    HSBC USA and JPMF are members of FIA, a U.S.-based industry advocacy and education organization whose regular members are all futures commission merchants. As part of FIA, Defendants participate in the annual Futures & Options Expo, the International Derivatives Expo, and other events and meetings.   The FIA's board of directors includes the managing director and global co-head of JPMF's futures and options and OTC clearing, and Robert Cox, the managing director and head of futures at HSBC USA.   Richard Berliand, the chair of JPMorgan Futures and Options and head of JPMorgan-Bear Stearns' prime brokerage business, serves as special advisor to the board.

88.    HSBC Bank PLC and JPMS are members of FOA, an industry association of firms and institutions involved in the business of futures, options and other derivatives or that use those instruments in their businesses.   FOA's primary role is to represent its members' interests in the public and regulatory domain and to deliver support services to its members.   Mr. Berliand of JPMF serves as special advisor to FOA's board of directors.

89.     JPMorgan Chase and HSBC NA are members of the LBMA. The LBMA is a London-based trade association that represents the London wholesale gold and silver bullion markets.

## Motive to Conspire

90.     Defendants' massive short positions exceeded existing world silver inventories, according to at least one prominent trader's public testimony. Because Defendants held significant naked short positions in COMEX silver futures and options contracts, particularly after JPMorgan's acquisition of Bear Stearns and its large silver short positions in early 2008, they were motivated to keep prices suppressed and roll-over their large short positions into succeeding months. If silver prices increased, Defendants would be obligated to cover their short positions, and thus would incur large losses or deliver actual silver in quantities significantly in excess of what was actually available in the marketplace. Defendants' conspiracy prevented those scenarios from occurring.

## Actions Against Independent Economic Self-Interest

91.     Each of the Defendants would have been more likely to take short positions if they knew beforehand and were confident that the other Defendants would do the same. To be sure of their competitors' actions, Defendants engaged in collusion, including signaling and spoof orders discussed above. Absent collusion, it would not have been in each Defendant's independent economic self-interest to engage in this conduct, as the heavy risks would outweigh any possible rewards.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

92.     Defendants' unlawful conduct was inherently self-concealing. Defendants engaged in secret conduct in order to manipulate prices for COMEX silver futures and options contracts.

93.     Defendants fraudulently concealed their participation in the conspiracy by, among other things, engaging in secret communications in furtherance of the conspiracy. Because of such concealment, and because such a conspiracy as the type alleged here is inherently self-concealing, Plaintiff and class members could not have discovered the existence of the conspiracy and manipulation earlier than the recent public comments made by Commissioner Chilton disclosing the existence of fraudulent conduct.

94.     Defendants also fraudulently concealed the conspiracy by agreeing among themselves to keep the conspiracy secret and not to discuss the conspiracy publicly or with outsiders.

95.     Plaintiff and class members were lulled into believing that the profitability of long positions under COMEX silver futures and options contracts was determined by normal market conditions, as opposed to manipulative and conspiratorial conduct by Defendants and their co-conspirators.

96.     Plaintiff and class members had no knowledge of Defendants' unlawful conduct, or of any facts that reasonably could or would have led to the discovery thereof, until they became public in or around the time of Commissioner Chilton's public statements made on October 26, 2010.

97.     At all relevant times and in all relevant aspects, Plaintiff and class members exercised reasonable diligence.

98.     No facts or information available to Plaintiff and class members before October 26, 2010, if investigated with reasonable diligence, could or would have led to the discovery of the unlawful conduct alleged herein.

99.     Because Defendants utilized practices and conduct that were designed to and did conceal the existence of their wrongful conduct, Plaintiff and class members could not have discovered the unlawful conduct's any earlier than the October 26, 2010 public disclosure.

100.     Because Defendants' unlawful conduct was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and class members were not aware of the unlawful conduct, did not know that prices had been conspiratorially manipulated in ways calculated to decrease the profitability of silver futures and options contracts, and did not know of or possess any information that would have caused a reasonably diligent person to investigate whether the misconduct occurred until October 26, 2010.

101.     Due to Defendants' unlawful conduct and fraudulent concealment of that conduct, Plaintiff and class members were prevented from learning the information needed to file suit against Defendants for the conduct alleged herein until October 26, 2010.

102.     As a result of the steps Defendants took to fraudulently conceal the unlawful conduct alleged herein and prevent Plaintiff and the class from filing suit against them for the misconduct alleged herein, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## ANTITRUST VIOLATIONS

103.     Beginning June 1, 2008 or slightly earlier and continuing until such time as the effects of Defendants' illegal conduct ceased, the exact dates presently unknown to Plaintiff, Defendants and their co-conspirators engaged in a continuing agreement, contract, combination, understanding, or conspiracy in restraint of trade to artificially manipulate prices in ways calculated to reduce the profitability of long positions under COMEX silver futures and options contracts.

104.    Based on the foregoing, and on information and belief, in forming and furthering their unlawful conspiracy, Defendants and their co-conspirators engaged in the following anticompetitive conduct, the purpose and effect of which were to artificially manipulate prices in ways calculated to reduce the profitability of long positions under COMEX silver futures and options contracts:

(a)    Defendants participated in communications and discussions to unlawfully discuss the prices governing the profitability of long positions under COMEX silver futures and options contracts and to otherwise share information relating to them;

(b)    Defendants agreed during those communications and discussions to unlawfully manipulate prices in ways calculated to reduce the profitability of long positions under COMEX silver futures and options contracts;

(c)    Defendants signaled to each other their intent to manipulate prices in ways calculated to reduce the profitability of long positions under COMEX silver futures and options contracts and otherwise conspired with each other to effectuate the conspiracy; and

(d)    Pursuant to the conspiracy, Defendants knowingly and collusively traded in order to manipulate prices in ways calculated to reduce the profitability of long positions under COMEX silver futures and options contracts.

105.    Throughout the class period, Plaintiff and class members purchased long positions on COMEX silver futures and options contracts whose profitability was artificially suppressed by Defendants' misconduct.

106.    Defendants' contract, combination, or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

25

## EFFECTS OF THE CONSPIRACY

107.    As a result of Defendants' unlawful conduct, Plaintiff and class members have been injured in their business and property because they have earned less money on their long positions under COMEX silver futures and options contracts that they entered into, liquidated or permitted to expire than they would have in a competitive market.

108.    The unlawful contract, combination or conspiracy has had at least the following effects:

(a)    the profitability of long positions under COMEX silver futures and options contracts has been artificially depressed; and

(b)    purchasers of long positions under COMEX silver futures and options contracts have been deprived of the benefit of free and open competition.

## COUNT I

## VIOLATION OF COMMODITY EXCHANGE ACT, 7 U.S.C. § 1

109.    Plaintiff incorporates by reference the preceding allegations.

110.    Plaintiff and class members purchased long positions under COMEX silver futures or options contracts during the class period whose profitability was artificially decreased by Defendants' unlawful conduct, and were harmed financially as a result of that conduct.

111.    Defendants' conduct, by and through their officers, directors, employees, agents, or other representatives, constitutes manipulation of COMEX silver futures and options contracts sold during the class period, in violation of Sections 9(a) and 22(a) of the Commodity Exchange Act, 7 U.S.C. §§ 13(a) and 25(a).

112.    Defendants are liable to Plaintiff and class members for damages that they incurred as a result of Defendants' violations of the Commodity Exchange Act.

26

## COUNT II

### AIDING AND ABETTING VIOLATIONS
### OF COMMODITY EXCHANGE ACT, 7 U.S.C. § 25

113.    Plaintiff incorporates by reference the preceding allegations.

114.    Defendants, by and through their officers, directors, employees, agents, or other representatives, knowingly aided, abetted, counseled, induced, or procured the alleged violations of the Commodity Exchange Act alleged herein. Defendants committed these acts knowing of each other's manipulation of prices in ways calculated to suppress the profitability of long positions under COMEX silver futures and options contracts, and they willfully intended to assist these manipulations to cause the profitability of silver futures and options contracts to be suppressed during the class period, in violation of Section 22(a)(1) of the Commodity Exchange Act, 7 U.S.C. § 22(a)(1).

115.    Defendants are liable to Plaintiff and class members for damages they incurred as a result of the alleged violations of the Commodity Exchange Act.

### COUNT III
### VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

116.    Plaintiff incorporates by reference the preceding allegations.

117.    Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to manipulate prices in ways calculated to decrease the profitability of long positions under COMEX silver futures and options contracts, in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

118.    Plaintiff and class members have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. This injury is

of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

119.    Accordingly, Plaintiff and class members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys fees.

## COUNT IV
## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW ("GBL") § 349

120.    Plaintiff incorporates by reference the preceding allegations.

121.    Defendant engaged in deceptive acts and unfair trade practices in violation of GBL § 349 by manipulating, conspiring to manipulate, prices in ways calculated to decrease the profitability of long positions under COMEX silver futures and options contracts by, among other acts:  (a) amassing extremely large short positions in silver futures and options contracts; (b) maintaining a substantial, concentrated amount of the open interest in silver futures; (c) communicating with each other, including signaling, their trades of COMEX silver futures and options contracts; and (d) submitting unconsummated but publicized orders that they withdrew before they could be executed (known as "spoof orders") but that still influenced pricing of COMEX silver futures and options contracts.

122.    As a direct and proximate result of Defendants' unlawful conduct in violation of GBL §349, Plaintiff and class members were deprived of the opportunity to trade in an open and unrestrained market and were forced to pay supracompetitive prices

123.    Plaintiffs and members of the have been injured by reason of Defendants' conduct in violation of GBL § 349  alleged herein.  Their injury consists of being denied the benefits of free and unrestrained competition and paying higher prices than they would have paid in the

28

absence of these violations. This injury is of the type New York GBL §349 was designed to prevent and directly results from Defendant's unlawful conduct.

## COUNT V
## UNJUST ENRICHMENT AND RESTITUTION

126.   Plaintiff incorporates by reference the preceding allegations.

127.   It would be inequitable for Defendants to be permitted to retain the benefit which Defendants obtained from their manipulative acts and at the expense of Plaintiff and members of the Class.

128.   Plaintiffs and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

129.   Alternatively or additionally, each Defendant should pay restitution or its own unjust enrichment to Plaintiff and members of the Class.

## DEMAND FOR JURY TRIAL

124.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

A.   That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

B.   That Defendants' conduct be adjudged to have violated Sections 9(a) and 22(a) of the Commodity Exchange Act, 7 U.S.C. §§ 13(a) and 25(a).

C. That Defendants' conduct be adjudged to have violated Section 22(a)(1) of the Commodity Exchange Act, 7 U.S.C. § 22(a)(1) and New York law as alleged herein.

D. That judgment be entered for Plaintiff and the class against Defendants for the amount of damages sustained by Plaintiff and the class as a result of Defendants' violations of the Commodity Exchange Act.

E. That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have violated of Section 1 of the Sherman Act, 15 U.S.C. § 1.

F. That judgment be entered for Plaintiff and class members against Defendants for three times the amount of damages sustained by Plaintiff and the class as allowed by law.

G. That Plaintiff and the class recover pre-judgment and post-judgment interest as permitted by law.

H. That Plaintiff and the class recover their costs of the suit, including attorneys' fees, as provided by law.

I. That Defendants be enjoined from continuing their participation in the alleged conspiracy.

J. For such other and further relief as is just under the circumstances.

Dated: New York, New York
November 29, 2010

By: /s/ Douglas R. Hirsch

Douglas R. Hirsch (DH-4172)
Samuel J. Lieberman (SL-9608)
Charles H. Dufresne, Jr. (CD- 4864)
**SADIS & GOLDBERG LLP**
551 Fifth Avenue, 21st Floor
New York, NY 10176
Tel: 212-573-6660
Fax: 212-573-6661
dhirsch@sglawyers.com
slieberman@sglawyers.com
cdufresne@sglawyers.com

*Attorneys for Plaintiffs*